J-S09016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.G.L.T., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.L., MOTHER | : : : : : : : | |
| | : | No. 2977 EDA 2019 |

Appeal from the Order Entered September 19, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000652-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: R.G.L.T., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.L., MOTHER | : : : : : : : | |
| | : | No. 2978 EDA 2019 |

Appeal from the Order Entered September 19, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001578-2018

BEFORE:   SHOGAN, J., LAZARUS, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED AUGUST 03, 2020**

C.L. (Mother) appeals[1] from the trial court's orders involuntarily

terminating her parental rights to her daughter, R.G.L.T. (Child) (born 3/18),

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On December 30, 2019, our Court *sua sponte* consolidated the two appeals
at Nos. 2977 and 2978 EDA 2019.  **See** Pa.R.A.P. 513.

and changing Child's permanency goal to adoption. After careful review, we affirm.

The Philadelphia Department of Human Services (DHS) first became involved with Mother's family in March 2018, when Mother and Child tested positive for phencyclidine (PCP) after Child's birth at Hahnemann University Hospital. At the time of Child's birth, Mother did not have appropriate housing for Child and was unemployed. Mother admitted to using PCP nine days before Child was born. Mother has a history of schizophrenia, bipolar disorder and post-traumatic stress disorder (PTSD). Child was placed with maternal grandmother (Grandmother).

On April 12, 2018, Mother voluntarily enrolled in outpatient treatment at Caring Together, a substance abuse treatment facility. On May 30, 2018, Mother entered a long-term mother/baby substance abuse treatment program where Child resided with her. On June 20, 2018, Mother contacted DHS and indicated that she planned to leave the treatment program. One week later, DHS took protective custody of Child and placed her with Grandmother, a pre-adoptive home where Child still resides. After a hearing, the trial court adjudicated Child dependent on July 9, 2018, and fully committed Child to DHS' custody. Mother was ordered to undergo: a drug screen; drug monitoring; three random drug screens prior to the next court listing; and housing education. Mother was permitted to have supervised visits with Child twice a week.

On September 23, 2018, Mother's plan objectives were identified as follows: attend court-ordered dual diagnosis monitoring (substance abuse and mental health); comply with random drug screens; obtain appropriate housing; comply with all court orders; sign behavioral health authorization forms; and participate in parenting education. The goal for Child remained "return to parent." At an October 2018 permanency review hearing, Mother was re-referred for a "forthwith" drug screen, random drug screens and monitoring, as well as mental health monitoring. Her visits with Child were modified to "liberal supervision," to be supervised by Grandmother at Grandmother's home.

In November 2018, Mother's supervised visits were moved to DHS facilities, at Grandmother's request; Grandmother alleged that Mother would come to the visits at her home high on drugs. N.T. Termination Hearing, 9/19/19, at 12. In January 2019, the court re-referred Mother for a "forthwith" drug screen, random drug screens, and dual diagnosis monitoring with a progress report. The trial court also ordered the Community Umbrella Agency (CUA) to refer Mother for housing services. Mother's CUA case manager testified that between June 20, 2019 and September 2019, Mother had attended six out of eighteen scheduled visits and tardiness when she does attend a visit. *Id.* at 13.

On September 4, 2019, DHS filed petitions to change Child's permanency goal to adoption and to involuntarily terminate Mother's parental

rights to Child.[2]  On September 19, 2019, the trial court held a termination hearing at which CUA case manager Erica MacFadyen, Mother, and Father[3] testified.[4]  After the hearing, the court entered orders terminating Mother's parental rights pursuant to sections 2511(a)(1), (2), (5), (8) and (b)[5] of the Adoption Act and changing the permanency goal to adoption.[6]  Mother filed timely notices of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.  On appeal, Mother presents the following issues for our consideration:

> (1)  Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, C.L.[,] pursuant to 23 Pa.[]C.S.A. [§] 2511(a)(1)[,] where Mother presented

---

[2] At the termination hearing, Mother's counsel stipulated to the facts, but not their veracity, contained in the goal change/termination petitions.  **See** N.T. Termination Hearing, 9/19/19, at 9.

[3] Mother appeared fifty-five minutes late for the hearing.  **Id.** at 44.  However, the trial judge reopened the case in the "interest of justice" to permit her and Father to testify.  **Id.** at 45.

[4] At the termination hearing, Child Advocate, Shareen Ginyard, Esquire, represented Child.  **See** 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc), **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

[5] The court also terminated the parental rights of Child's Father.  He is not a party to this appeal.

[6] 23 Pa.C.S.A. §§ 2101-2938.

- 4 -

evidence that she made efforts to perform her parental duties.

(2)     Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, C.L.[,] pursuant to 23 Pa.[]C.S.A. [§] 2511(a)(2)[,] where Mother presented evidence that she made efforts to remedy any incapacity or neglect.

(3)     Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, C.L.[,] pursuant to 23 Pa.[]C.S.A. [§§] 2511(a)(5) and (a)(8)[,] where the evidence showed that the child was removed from Mother's [sic], however, Mother presented evidence that the conditions that existed at the time of removal have been remedied.

(4)     Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, C.L.[,] pursuant to 23 Pa.[]C.S.A. [§] 2511(b)[,] where evidence was presented that Mother has a positive parental bond with the child that would be detrimental to sever.

Mother's Brief, at 8.

Before addressing Mother's claims on appeal, we must first resolve a procedural issue presented in the case. In **Commonwealth v. Williams**, 206 A.3d 573 (Pa. Super. 2019), this Court recently explained:

Pennsylvania Rule of Appellate Procedure 341(a) directs that "an appeal may be taken as of right from any final order of a government unit or trial court." Pa.R.A.P. 341(a). "The Official Note to Rule 341 was amended in 2013 to provide clarification regarding proper compliance with Rule 341(a)[.]" **Commonwealth v. Walker**, 185 A.3d 960, 976 (Pa. 2018). The Official Note now reads:

Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeals must be filed. **Commonwealth v. C.M.K.**, [] 932 A.2d 111, 113 & n.3 (Pa. Super. 2007) (quashing appeal taken by single notice of appeal from order on remand for consideration under Pa.R.Crim.P. 607 of two [defendants]' judgments of sentence).

Pa.R.A.P. 341, Official Note.

*Id.* at 575.

In ***Walker***, our Supreme Court found the above-language constituted "a bright-line mandatory instruction to practitioners to file separate notices of appeal." ***Walker***, 185 A.3d at 976-77. Accordingly, the ***Walker*** Court held that "the proper practice under Rule 341(a) is to file *separate* appeals from an order that resolves issues arising on more than one docket. The failure to do so requires the appellate court to quash the appeal." ***Id.*** at 977 (emphasis added). The Court made its holding prospective, recognizing that "[t]he amendment to the Official Note to Rule 341 was contrary to decades of case law from this Court and the intermediate appellate courts that, while disapproving of the practice of failing to file multiple appeals, seldom quashed appeals as a result." ***Id.*** Furthermore, the ***Walker*** Court directed that "in future cases Rule 341 will, in accordance with its Official Note, *require* that when a single order resolves issues arising on more than one lower court docket, separate notices of appeal *must* be filed. The failure to do so will result in quashal of the appeal." ***Id.*** (emphasis added).

Recently, our full Court revisited the ***Walker*** holding in ***Commonwealth v. Johnson***, 2020 PA Super 164 (Pa. Super. filed July 9, 2020) (en banc) and ***Commonwealth v. Larkin***, 2020 PA Super 163 (Pa. Super. filed July 9, 2020) (en banc). In those cases our Court concluded that

"in so far as **Creese**[7] stated 'a notice of appeal may contain **only one** docket number[,]' . . . that pronouncement is overruled." **See Johnson**, **supra** at *12 (emphasis in original); **see also Larkin**, **supra** at *3 (recognizing that **Johnson** "expressly overruled **Creese** to the extent that **Creese** interpreted **Walker** as requiring the Superior Court to quash appeals when an appellant, who is appealing from multiple docket numbers, files notices of appeal with all of the docket numbers listed on each notice of appeal."). Additionally, both cases reaffirmed the holding[8] in **Commonwealth v. Stansbury**, 219 A.3d 157 (Pa. Super. 2019), where we declined to quash an appeal when a *pro se* defendant filed a single notice of appeal listing two docket numbers. In that case the trial court advised the defendant "that he has thirty day from this day, to file "**a** written notice of appeal to the Superior Court." **Id.** at 159 (emphasis in original). Our Court concluded that the defendant had been misinformed by the trial court, which amounted to a "breakdown in the court system" and excused the defendant's lack of compliance with **Walker**. **Id.** at 160.

_____

[7] **See Commonwealth v. Creese**, 216 A.3d 1142, 1144 (Pa. Super. 2019) (construing mandates of **Walker** to mean that "we may not accept a notice of appeal listing multiple docket numbers, even if those notices are included in the records of each case.").

[8] In fact, **Larkin** extended the **Stansbury** holding to *all* defendants, whether represented or *pro se*. **See Larkin**, **supra** at *6 ("We agree with the panel in **Stansbury** and reaffirm its holding that we may overlook the requirements of **Walker** where, as here, a breakdown occurs in the court system, and a defendant is misinformed or misled regarding his appellate rights.").

Here, Mother filed two separate notices of appeal, with two different time-stamps, for her two cases below; the notices each listed both trial court docket numbers. Similar to the facts of **Johnson**, **supra**,[9] each of the notices had some kind of designation distinguishing which notice applied to which docket. Here, Mother's counsel included one of the following handwritten notations, "Involuntary Termination" or "Dependency," identifying which notice corresponded with each appealed case. Since it "is of no consequence" that Mother's notice of appeal contained more than one docket number, **Johnson**, **supra** at *11; **Larkin**, **supra** at *3, and because Mother complied with **Walker** by "fil[ing] *separate* appeals from an order that resolves issues arising on more than one docket," **id.** at 977, we decline to quash the appeal for violating **Walker** and its attendant requirements. Therefore, we shall proceed to address the issues Mother raises on appeal.

In her first three issues, Mother contends that the trial court abused its discretion by terminating her parental rights to Child under sections 2511(a)(1), (2), (5) and (8) [10] of the Adoption Act, where she "had taken substantial steps towards satisfying all of her single case plan objectives,"

_____

[9] In **Johnson**, the defendant listed four docket numbers on all four notices. However, he also italicized one relevant docket number on each notice to identify which notice corresponded with each appealed case.

[10] We can affirm the trial court's decision regarding the termination of parental rights with regard to any singular subsection of section 2511(a). **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

. . . "did not act with a settled purpose of relinquishing her parental rights," . . . "maintained constant contact with Child," . . . "remedied the conditions that caused [] Child to come into care," . . . and "is ready for reunification with [C]hild." Mother's Brief, at 12.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Mother argues that at the time of the termination hearing, she was actively engaged in mental health and alcohol and drug treatment, consistently visited with Child, and was looking for employment. She also claims that she has completed parenting classes. However, at the termination hearing, Mother's counsel admitted "it's clear that [Mother] still has the outstanding goal of drug and alcohol," but that she wants more time to work on her goals and also obtain a mother-baby placement. N.T. Termination

Hearing, 9/19/19, at 41. While it is admirable that Mother wants to finally work toward achieving her reunification goals, our Court has repeatedly noted that "parental rights may not be preserved by waiting for some more . . . convenient time for the performance of parental duties and responsibilities." *In re D.J.S.*, 727 A.2d 283, 287 (Pa. Super. 1999) (citation omitted). Mother, herself, testified that she "kind of keep[s] putting everything before what [she] need[s] to put it for (ph), which is [Child]. So, that's no one else's fault but mine. I own up to all of that." *Id.* at 41.

Here, the trial judge noted, parental responsibilities require affirmative actions —to love, protect, and support a child. *Id.* at 42. *See In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) ("A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. [T]his [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.") (citations omitted). As the child advocate astutely noted at the termination hearing, "the bottom line is that [Mother and Father] have failed and refused to perform their parental duties. These goals have been cold throughout the life of the case." N.T. Termination Hearing, 9/19/19, at 38. The most critical reason for Child's placement —Mother's drug abuse— continues to exist. Mother tested positive for PCP throughout the entire year that Child was in placement and has been a no-show for many of her random drug screens. Due to Mother's drug dependency, her visits with Child never progressed to unsupervised. Finally, at the time of the termination hearing,

Mother had not been consistent with court-ordered mental health treatment (including failing to take prescription medications), did not have suitable housing for Child, and was unemployed. *Id.* at 18-20. Mother also admitted at the hearing that she was unable to financially care for Child and that she still had to "work on finding . . . a job and getting [herself] together so she can be a good mother for [Child]." *Id.* at 56-57.

Where Mother has failed to address the issues that led to Child's removal and has not remotely achieved her goals to warrant reunification with Child, we cannot conclude that the trial court abused its discretion or committed an error of law when it terminated Mother's parental rights under section 2511(a)(2).[11] *In re: A.R.*, *supra*.

In her final issue on appeal, Mother contends that the trial court improperly terminated her parental rights to Child under section 2511(b) where: Mother maintained consistent contact with Child; Mother's twice, weekly visits with Child were appropriate; Child and Mother have "good interaction;" and termination and goal change "would be detrimental as the Child has a positive parental bond with Mother." Mother's Brief, at 12, 22.

_____

[11] Under section 2511(a)(2), a parents rights to his or her child may be terminated when:

> [The] repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

In **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013), our Supreme Court noted "if the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.'" 23 Pa.C.S.A. § 2511(b). Moreover, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of a child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005). Further, in **In re E.M.**, 620 A.2d 481, 485 (Pa. 1993), this Court held that the determination of a child's "needs and welfare" requires an examination of "the status of the natural parental bond." However, "in cases where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). As such, "the extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." **Id.** at 763.

With regard to section 2511(b), CUA case worker MacFadyen testified that Mother and Child have "good" interaction at visits; however, she also indicated that Mother's expectations with regard to Child are not age-appropriate. N.T. Termination Hearing, 9/19/19, at 14. The case worker also testified that Child has a strong bond with her caregiver, Grandmother, with whom she has lived almost her entire life and who is also a pre-adoptive resource. **Id.** at 15. Grandmother provides Child with the emotional, physical and developmental support she needs. **Id.** Moreover, Child is thriving in Grandmother's care —the only stable caregiver she has had her entire life. **Id.** at 11, 15-16. Case worker MacFadyen testified that it would be in Child's

best interest to change the goal to adoption, and Child would not suffer any irreparable harm if Mother's parental rights were terminated. *Id.* at 16. The trial judge found case worker MacFadyen credible and, critically, determined that Child's paramount needs for "stability and continuity" in her everyday life were being met by Grandmother, warranting termination under subsection 2511(b). *Id*. at 43.

Instantly, the record contains no evidence of a demonstrated "bond" between Child and Mother. In fact, since Child has only been in Mother's care for one month of her entire life, it is not unreasonable to infer that no true parent-child bond exits.[12] *See In re K.Z.S.*, *supra*. Moreover, where Grandmother has been Child's sole provider of security and stability for all but one month of Child's life, is a pre-adoptive resource, and Child thrives developmentally, emotionally, and physically in her care, the court properly determined that termination was proper under section 2511(b). *See In re Adoption of C.D.R.,* 111 A.3d 1212, 1219 (Pa. Super. 2015) ("[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.") (citation omitted).

Orders affirmed.

_____

[12] In fact, Mother does not even allege in the argument section of her appellate brief that she and Child have a bond. Rather, she claims that she has "consistent" visits with Child twice a week, Appellant's Brief, at 22, that the visits "go well" and that she and Child have "good interaction." *Id.*

- 13 -

J-S09016-20

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/3/20

- 14 -